RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0103p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

MARK W. MAYHEW,

            *Plaintiff-Appellant,*

    *v.*

TOWN OF SMYRNA, TENNESSEE; HARRY GILL,

            *Defendants-Appellees.*

No. 16-5103

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cv-01653—Aleta Arthur Trauger, District Judge.

Argued: January 25, 2017

Decided and Filed: May 11, 2017

Before: GILMAN, GRIFFIN, and STRANCH, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Douglas B. Janney III, Nashville, Tennessee, for Appellant. Robert M. Burns, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellees. **ON BRIEF:** Douglas B. Janney III, Nashville, Tennessee, for Appellant. Robert M. Burns, Brooke McLeod Coplon, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellees.

---

**OPINION**

---

GRIFFIN, Circuit Judge. Mark Mayhew alleges the Town of Smyrna, Tennessee, and its city manager, Harry Gill, terminated his employment in retaliation for engaging in two distinct acts protected by the First Amendment: reporting violations of federal and state regulatory requirements at the town's wastewater-treatment plant; and voicing concerns regarding Smyrna's

hiring practices. The district court disagreed and entered summary judgment in defendants' favor. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

I.

Plaintiff was a long-time employee of Smyrna's wastewater-treatment plant. The plant is subject to extensive regulation by the Environmental Protection Agency ("EPA") and the Tennessee Department of Environment and Conservation ("TDEC"), including various water-quality permit and reporting requirements under the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES"). *See generally* 33 U.S.C. § 1342. TDEC administers the plant's NPDES permit, which sets the parameters for the limits on certain agents or chemical compounds that the plant is allowed to discharge into public waterways. The regulatory regime requires the plant to conduct various water and other treatment by-products tests, provide these results to the EPA (by way of an "annual sludge report") and TDEC (by way of a "monthly operating report" ("MOR") and a "monthly discharge monitoring report" ("DMR")), and report any discharges in violation of its permit's parameters to TDEC.

Mayhew was the plant's lab supervisor, overseeing the collection and analysis of test samples as part of the plant's reporting requirements. His duties included: (1) ensuring lab activities met EPA and TDEC quality-control standards and followed "proper procedures and documentation"; (2) performing all work necessary to maintain the plant's NPDES permit; (3) maintaining records in compliance with applicable regulations; (4) reviewing daily records "to ensure accuracy and completeness"; (5) completing MORs and DMRs; and (6) reviewing and documenting "all OSHA, Federal, State and City regulations, as they impact the wastewater plant laboratory and report[ing] any appropriate situations and accidents immediately to management."

Smyrna also mandated that Mayhew obtain a TDEC "Grade IV" wastewater-treatment certification. This certification required Mayhew to "comply with the laws, rules, permit requirements, or orders of any governmental agency or court which govern the water supply system or the wastewater system he/she operates." TDEC Rule 0400-49-01-.11(2). Under TDEC's certification requirements, Mayhew could have his certification revoked if he failed to

"comply with the monitoring, sampling, analysis, or reporting requirements for a water supply system facility or wastewater system facility," failed to "notify" TDEC of conditions that are "violative of a standard of water quality promulgated by any government agency," or prepared "laboratory analysis results for the system that . . . [c]ontain inaccurate data and are known or should be known . . . to be false." TDEC Rule 0400-49-01-.11(2)(b-d), (4)(c).

As lab supervisor, Mayhew learned that one of the plant's fellow supervisors, chief operator Leland Noble, was engaging in questionable conduct related to the plant's collection, recording, and reporting of its water samples. This conduct included: (1) pressuring Mayhew to either not report certain results or change results to be submitted to the EPA and TDEC; (2) refusing to allow Mayhew to sample on certain days based on plant conditions to avoid bad results, thus "cherry picking" data; (3) changing Mayhew's collected test results; (4) expanding sample sizes to "throw out any bad numbers," but reporting as if the sample size was smaller; and (5) logging incomplete tests as complete.

Mayhew reported his concerns about Noble's actions to then-plant manager Mike Roberts beginning in February 2014. He went to Roberts first because he wanted to "work[] within the chain of command." Roberts responded to these concerns by looking into them himself. Noble's conduct "increased in intensity and activity" to almost a "daily basis" from February to June 2014.

Following Roberts's resignation in June 2014 after an investigation by Smyrna officials on an unrelated matter, Mayhew began reporting his concerns to Roberts's supervisors, the assistant director of utilities Mike Parker, utilities operation manager Aubrey Blanks, and director of utilities Mike Strange. Strange and Parker relayed Mayhew's complaints to Smyrna's city manager, defendant Harry Gill. Strange and Parker also conducted follow-up conversations with several employees at the plant who raised various concerns about management (including about Noble) during their initial investigation into Roberts's misconduct. When Mayhew raised his concerns about Noble in these conversations, Strange and Parker responded by telling him that "they would take care of this matter." According to Mayhew, Strange and Parker "ma[de] some progress" in this regard.

But then, Gill promoted Noble to plant manager, and promoted Gill's nephew, Kyle Gill, to chief operator. He did so without advertising the positions to the public, requiring the two to apply, or permitting anyone else to apply, interview, or be considered for the positions. And he did so, according to Mayhew, despite them failing to possess certain qualifications set forth in the respective job descriptions.

Following these promotions in the face of Mayhew's reports about Noble's conduct, Mayhew "felt [he] had no other alternative" but to "document this with [Smyrna Human Resources Director] Jeff Craig" and with Gill. In his words, it was "imperative to escalate my documentation activities that management was alerted to." Accordingly, he emailed Strange and Parker on July 1, 2014, complaining about Noble's and Kyle Gill's lack of qualifications, their hiring outside of "normal hiring protocol," and commenting that he found "it disturbing that the Town Manager would promote someone [(Noble)] that [sic] is clearly responsible for the present working conditions of having to work in an environment of possible retaliation which include hostilities in the workplace, the very same person that [sic] put pressure on [him] to hide violations, of which [he] refused to do." Mayhew characterized Noble's hiring as putting Mayhew "in a precarious position," based on his concern that Noble would attempt to manipulate, retaliate against, or fire him.

Strange forwarded Mayhew's email to Gill, who was "furious," and "offended that [Mayhew] was questioning [his] ethics with respect to who[m he] hired." Gill found the email to be "insubordinate" and "disrespectful," as it "implied that [Mayhew] would be unwilling to work with [Noble]," and directed Strange to suspend Mayhew.

Mayhew, Gill, Strange, Craig, and Smyrna's town attorney, Jeff Peach, met on July 7, 2014. The parties significantly dispute who said what at this meeting, but we view the facts in the light most favorable to Mayhew. Gill "started right off" by telling Mayhew how "upset he was" about the email and that "[w]e will see if you still have a job today." When asked whether Mayhew could work with Noble, Mayhew stated "Yes, I would – I'm able to work with him, and I will do my very best, sir." Gill then accused Mayhew of being insubordinate and "bitter against Leland Noble," to which Mayhew responded: "No, sir. I'm not bitter towards him. This has nothing to do with personal issues. It has to do with what I reported." Gill also told Mayhew

that he could "hire any way he sees fit." Gill terminated Mayhew's employment at the end of the meeting. He did so for two reasons: (1) "there wasn't really a full declaration that he was willing to work with [Noble]. He said, I would do my best"; and (2) "his work ethics could be [compromised] if he had to work with [Noble]."

Mayhew commenced this litigation shortly thereafter, alleging defendants violated the First Amendment and Tennessee's Public Protection Act by terminating his employment in retaliation for his reporting activities. Following discovery, the district court granted summary judgment in favor of defendants as to plaintiff's First Amendment retaliation claim and declined to exercise supplemental jurisdiction over his state-law claim. Having refiled his Public Protection Act claim in Tennessee state court, Mayhew appeals only the district court's dismissal of his First Amendment claim.

## II.

We review the district court's grant of summary judgment de novo. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the nonmovant, *Rogers*, 737 F.3d at 1030, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.

### A.

It is long "settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). However, because "government offices could not function if every employment decision became a constitutional matter," *id.* at 143, a public employee's First Amendment rights are narrower than the citizenry at large. *See, e.g., Pickering v. Bd. of*

*Educ.*, 391 U.S. 563, 568 (1968).  That is, "the First Amendment protects a public employee's right, *in certain circumstances*, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (emphasis added).

A public employee alleging First Amendment retaliation must satisfy three requirements. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337–38 (6th Cir. 2010).  First, the employee must speak on "matters of public concern."  *Id.* at 337 (citing *Connick*, 461 U.S. at 143).  Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id.* at 338 (citing *Garcetti*, 547 U.S. at 421).  Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id.* (quoting *Pickering*, 391 U.S. at 568).

B.

We begin with a procedural question:  whether the Supreme Court's most recent First Amendment public employment case, *Lane v. Franks*, 134 S. Ct. 2369 (2014), abrogated *Connick* and our circuit's subsequent case law holding that the question of "whether . . . a public employee's speech is protected [i]s one of law, not one of both fact and law."  *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010).

In *Connick*, the Supreme Court unequivocally stated that "[t]he inquiry into the protected status of speech is one of law, not fact."  461 U.S. at 148 n.7.  However, the Supreme Court's holding in *Garcetti* "that the question of whether a statement was spoken as a public employee or as a private citizen for First Amendment purposes was 'a practical one,' requiring a fact-specific inquiry into the 'duties an employee actually is expected to perform,'" resulted in a circuit split as to "whether the inquiry into the protected status of speech remains one purely of law as stated in *Connick,* or if instead *Garcetti* has transformed it into a mixed question of fact and law." *Fox*, 605 F.3d at 350 (quoting *Garcetti*, 547 U.S. at 424–25 and *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir. 2008)).

As we summarized in *Fox*, the Third, Seventh, Eighth, and Ninth Circuits have concluded that "whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law," while the D.C., Fifth, and Tenth Circuits have stayed

true to *Connick*'s holding. *Id.* (citations omitted). We found this circuit split to be "ultimately irrelevant" in *Fox* because "[i]n our post-*Garcetti* opinions we have consistently described the question of whether, in a First Amendment retaliation action, a public employee's speech is protected as one of law, not one of both fact and law." *Id.* at 350. We also noted, given the summary judgment standard, a district court is required to take the plaintiff's factual allegations as true. In *Fox*, however, there were not any genuine issues of material fact regarding the scope of the plaintiff's employment. *Id.* at 351 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Following *Fox*, we have consistently analyzed the protected status of an employee's conduct as solely one of law. *See, e.g.*, *Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012); *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1047 (6th Cir. 2014) (relying on *Connick*, among others, for this proposition).

Mayhew argues *Lane* changes this landscape. The issue before the Court in *Lane* was "whether the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities." 134 S. Ct. at 2378. The Eleventh Circuit concluded that, because the employee testified in a public corruption trial about matters "learned of . . . in the course of his employment . . . , *Garcetti* requires that his testimony be treated as the speech of an employee rather than that of a citizen." *Id.* at 2379. The Supreme Court rejected this broad reading, emphasizing *Garcetti*'s focus on the *scope* of an employee's duties, not *where* an employee learns of the content of his speech:

> But *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment. . . . [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee— rather than citizen—speech. *The critical question under* Garcetti *is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.*

*Id.* (emphasis added). We have subsequently characterized *Lane* as "narrowing" *Garcetti* by reason of the Supreme Court's addition of "'ordinary' as a modifier to the scope of an employer's job duties, and by *Lane*'s admonishment that speech is not transformed into employee—rather than citizen—speech simply because it concerns information acquired by

virtue of the speaker's public employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (brackets, citations, and quotation marks omitted).

Seizing upon *Lane*'s repeated references to "ordinary job responsibilities" and "ordinary job duties," 134 S. Ct. at 2375, 2377–78, 2381, and *Boulton*'s "narrowing" characterization, Mayhew argues "*Lane* necessarily requires fact finding into whether parts of speech are within the scope of an employee's 'ordinary' or usual duties." To this end, he asks that we revisit our determination in *Fox* and follow some of our sister circuits' application of the mixed question of facts and law standard.[1] *See, e.g.*, *Flora v. Cty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015); *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013) (en banc); *Posey*, 546 F.3d at 1127.

We have consistently applied the question of law standard post-*Lane*, *see, e.g.*, *Holbrook v. Dumas*, 658 F. App'x 280, 284 n.3 (6th Cir. 2016); *Devlin v. Kalm*, 630 F. App'x 534, 537 (6th Cir. 2015) (per curiam), and see no reason to accept Mayhew's request. *Lane* neither acknowledged *Connick*'s statement that "[t]he inquiry into the protected status of speech is one of law, not fact," 461 U.S. at 148 n.7, nor referenced the circuit split we identified in *Fox*. Simply, *Lane* did not address the issue and did not overrule *Connick*. It is not our prerogative to set this binding precedent aside until the Supreme Court tells us we must. *See Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) (admonishing lower courts against "conclud[ing the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent"). Nor do Mayhew's citations to decisions from our sister circuits support the extension he requests—they either rely upon pre-*Lane* authority for the mixed question of law and fact standard, *see, e.g.*, *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260–61 (9th Cir. 2016); *Flora*, 776 F.3d at 175, or were decided before *Lane*. *See, e.g.*, *Dahlia*, 735 F.3d at 1072; *Posey*, 546 F.3d at 1129. *See also Fox*, 605 F.3d at 350 (collecting authorities).

---

[1]Mayhew first raised this argument before the district court in his sur-reply. Ordinarily, we would not address this untimely argument. *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010). However, because the district court permitted the sur-reply and addressed the merits of Mayhew's argument, and because the parties have fully addressed the merits on appeal, we make an exception to our general rule. *See Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 444 (6th Cir. 2012).

In sum, the district court did not err by concluding that the determination as to whether Mayhew engaged in protected speech was one of law.

IV.

With this preliminary question resolved, we turn to whether Mayhew's complaints about Noble's misconduct fell outside the scope of his ordinary job responsibilities pursuant to *Lane*, thus constituting speech as a citizen for First Amendment purposes. In construing *Lane*, we have commented that although *Garcetti* carves out an exception to First Amendment protection for speech that "owes its existence to a public employee's professional responsibilities," this exception "must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton*, 795 F.3d at 534. Or, in *Lane*'s words, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 134 S. Ct. at 2379.

Determining whether an employee speaks as a private citizen or as a public employee can be challenging. *See Boulton*, 795 F.3d at 533. The Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 547 U.S. at 424. Instead, the "proper inquiry is a practical one." *Id.* To aid in the assessment of a public employee's statement, "we must consider both its content and context." *Fox*, 605 F.3d at 348. In our pre-*Lane* case law, we recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). We have continued to utilize these "who, where, what, when, why, and how" considerations post-*Lane*, *see, e.g.*, *Holbrook*, 658 F. App'x at 288; *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527 (6th Cir. 2015); *Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 567 (6th Cir. 2015), which inform the answer to *Lane*'s "critical question": "whether the speech at issue is itself ordinarily within the scope of an employee's duties." 134 S. Ct. at 2379.

Mayhew's reporting of Noble's misconduct to Roberts and then to those in City Hall falls within his "ordinary job responsibilities." After all, his job was to oversee all water-sample testing required by state and federal regulations, including the plant's recording and reporting

requirements.  Most notably, he was required to "review and document all OSHA, Federal, State and City regulations, as they impact the wastewater plant laboratory and *report any appropriate situations and accidents immediately to management.*"  (Emphasis added.)  And report to management he did.

Mayhew's rebuttal is not persuasive.  In his deposition, Mayhew took the position that *any* reporting of illegal activity was outside the scope of his job duties because he had never done so before and his job was to ensure the accuracy of reports, not to submit reports about others' misconduct.  Mayhew thus contends his complaints about Noble's conduct were borne out of his civic and "moral responsibility," not his job functions.

This crabbed reading of his admitted job duties does not comport with *Lane*'s instruction that we focus on his "ordinary job responsibilities" and *Garcetti*'s mandate that we look at job duties *practically*.  Mayhew's entire function at the plant was to ensure water-testing standards were in compliance with federal and state regulatory mandates.  Yes, his job description did not specifically call upon him to report illegal conduct to management.  But, in the context of "all OSHA, Federal, State and City regulations," it required him to "report any appropriate situations and accidents immediately to management."  Mayhew does not dispute this—he admits he reported up the chain of command and did so because Noble's conduct "interfer[ed] with [his] ability to do []his job."  He also acknowledged that his TDEC certification required him to additionally report violations (to TDEC, which he did not).

Nor does *Garcetti*'s caution against parsing job descriptions in order to determine the scope of an employee's professional duties assist Mayhew, 547 U.S. at 424–25, for job descriptions are not irrelevant.  Indeed, we have repeatedly recognized the converse:  "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description."  *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007).  It would certainly be an anomaly to altogether ignore the role job descriptions play for purposes of defining an employee's job duties—especially in a case like this, where the employee does not contest any of the formal aspects of the job description requiring the employee to report issues to management.  It would also be in discord with our recent reiteration in *Boulton* that "most jobs carry with them an inherent duty of internal communication."

795 F.3d at 533; *see also Housey v. Macomb Cty.*, 534 F. App'x 316, 322 (6th Cir. 2013) (rejecting the argument that an employee's job duties did not include reporting misconduct when his responsibilities included ensuring compliance with policies, reporting "trouble spots and recommending corrective actions"); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (police officer tasked with training police dogs was "carrying out his professional responsibilities" and not speaking as a private citizen when he complained—without any obligation to do so—about the effects of reduced training).

We also do not agree with Mayhew that his reporting outside the plant to others within the city government fell outside his ordinary job responsibilities. This argument runs headlong into our precedent involving escalating reports up the organizational chart: "[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Fox*, 605 F.3d at 350 (citation omitted). It also asks us to view his job impractically: he was required to report "to management," which is not limited to those at the plant. Mayhew admitted his reports outside the plant went to "upper management," were all within his chain of command, and were about matters that were part of his ordinary job responsibilities. *Handy-Clay*'s distinction between reports in and outside that employee's department—a case Mayhew tells us is on point—is therefore not helpful to him. 695 F.3d at 542.

Allegations of violations of federal and state regulations should be taken seriously, especially when they involve the possibility of risk to the general public. *Lane* highlights the value we place on permitting public employees to comment on matters concerning their employment as they are "uniquely qualified to comment on matters concerning government policies that are of interest to the public at large." 134 S. Ct. at 2380 (quoting *San Diego v. Roe*, 543 U.S. 77, 80 (2004)). Our holding that Mayhew did not engage in protected speech when he complained about Noble's misconduct should not be construed as authorizing public employers to terminate employees complaining about illegal conduct. But given plaintiff's explicit job responsibilities to oversee the plant's water-sampling regime and report any issues regarding that regime, the district court correctly granted summary judgment in favor of defendants as to

Mayhew's First Amendment claim to the extent that it was grounded in his reports of Noble's misconduct.

V.

Mayhew's last issue on appeal is whether the district court erred in concluding he failed to advance a claim that he engaged in protected conduct when he complained about Smyrna promoting Noble and Kyle Gill, irrespective of its typical hiring practices and their qualifications (or lack thereof). We agree with Mayhew that the district court committed reversible error by holding Mayhew's complaint never pled this ground in support of his First Amendment claim, and that even if he did, it failed on the merits.

A.

The district court first dismissed Mayhew's claim on a procedural ground: "Mayhew did not explicitly argue that these complaints constitute a basis for his claim of First Amendment retaliation that is separate from, and independent of, his reporting of violations at the Plant until he improperly raised this argument in his Sur-Reply." Rather, despite acknowledging "the factual allegations regarding Mayhew's concerns about the promotions are detailed in the Complaint," the district court read Mayhew's First Amendment claim to encompass only his complaints about Noble's conduct:

> The gravamen of the Complaint is that the plaintiff was retaliated against for speaking out about water treatment processing and reporting violations, not about failure to adhere to hiring and promotion policies. This new theory truly tortures the language of the Complaint and the plaintiff's articulation of his theory of the case set out in the Initial Case Management Order and may not be injected into the case this late in the game.

We do not read Mayhew's complaint so narrowly.

The complaint more than adequately put defendants on notice of a First Amendment claim grounded in Smyrna's hiring practices within the meaning of Federal Rule of Civil Procedure 8. Paragraphs 10-13 detail Mayhew's very specific concerns regarding the manner in which Gill promoted Noble and Kyle Gill, including that they did not meet minimum qualifications for their respective promotions, and that Smyrna did not follow its normal job-

posting process in awarding these promotions. The next paragraph then sets forth the complaint's central theory: Gill fired Mayhew for sending his July 1, 2014, email. As described in Paragraph 14, that email documents Mayhew's three concerns:

> On July 1, 2014, at 3:43 p.m., Mr. Mayhew sent an email to Mr. Strange and Mr. Parker documenting Defendant Gill's circumvention of "normal hiring protocol" and practice; reiterating that he had reported concerns about Mr. Noble's conduct that "management was alerted to," including Mr. Noble's pressuring him to "hide violations, which Mr. Mayhew refused to do"; and reiterating his fear of "retaliation" for reporting, opposing, and refusing to remain silent about illegal activities.

(Brackets omitted.) Given this factual specificity connecting Mayhew's allegation that Smyrna did not properly follow hiring protocol, to complaining about this in his email, and to being fired for sending his email, the complaint unambiguously provided defendants with notice of a First Amendment claim based on these factual grounds. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a complaint need only "give the defendant fair notice of what the claim is and the grounds upon which it rests") (citation and ellipsis omitted); *cf. Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). The district court erred in concluding to the contrary.

B.

We review the district court's alternative holding—that "even if the court were to consider Mayhew's statements about the promotions to be a separate basis for Mayhew's claim of retaliation, they are not actionable under the First Amendment"—de novo. *Gillis v. Miller*, 845 F.3d 677, 689 (6th Cir. 2017). The district court concluded Mayhew's email represented a "personal concern regarding his job security" and his "dissatisfaction with Gill's decision to promote Noble," and was therefore best characterized as "an internal employee grievance." It also reasoned that Mayhew's complaints did not address a matter of public concern because he raised them only internally, as opposed to selecting a "mode of communication . . . that would 'bring to light actual or potential wrongdoing or breach of public trust.'" (quoting *Connick*, 461 U.S. at 148). The district court reasoned improperly.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S. Ct. at 2380 (internal quotation marks and citation omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. We examine "the *point* of the speech in question," *Boulton*, 795 F.3d at 534 (citation omitted), as "the pertinent question is not *why* the employee spoke, but *what* he said." *Westmoreland*, 662 F.3d at 719 (citation omitted). It is not "necessary for the entire expression to address matters of public concern, as long as some portion of the speech does." *Id.* (citing *Connick*, 461 U.S. at 149).

We have "recognized that the most difficult cases to adjudicate are 'mixed speech' cases, i.e., those in which the speech for which the employee claims First Amendment protection arises in the context of an employment grievance or other personnel dispute, but where the employee claims that some part of the speech also touches upon matters of public concern." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). And, following the Supreme Court's lead, we have consistently reiterated that allegations of public corruption "are exactly the type of statements that demand strong First Amendment protections." *Handy-Clay*, 695 F.3d at 543–44 (collecting cases). This was a tenet of *Lane* as well, where the Court stated "[t]he content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern." 134 S. Ct. at 2380.

There is no doubting Mayhew's complaints sound like an employee raising a personal grievance about a disliked supervisor and bleak future job prospects. One need look no further, as the district court did, to some of the content of his email:

> I'm going to do the best I can but after this most recent activity of bypassing hiring protocol and who was promoted and in the manner they were promoted, *I don't feel my position with the Town of Smyrna is secure.*
>
> This latest activity of placing Leland in a position over me has suddenly placed me in a precarious position. *I feel Leland will attempt to get rid of me and replace me with someone he can control and manipulate.* I feel he will hide NPDES violations if he thinks he can get away with it, as evidenced by the last 5 months

of activity. I've seen how Leland has done other people in the past. *I feel he will retaliate against me as it is just his nature.* This is why I feel it necessary to document.

(Emphasis added.)

Yet, the email also extensively documents his concerns with the hiring process in general, raising Noble's misconduct (and Smyrna's alleged disregard for these actions) as an example for why Smyrna should have followed its normal hiring procedures:

> It appears the Town of Smyrna has applied unfair and unequal practices in filling the two highest paid positions at the Smyrna Wastewater Treatment Plant on 6/27/14. It appears the Town Manager has bypassed normal hiring procedures to promote his nephew, Kyle Gill, as well as align him for the [plant] Manager position, by not allowing anyone else to apply for these two positions and circumventing normal hiring protocol.

> The final catalyst that ignited this type [of] email being generated, was Leland Noble being placed in position of authority over me as the new [plant] Manager, of which he didn't have to apply for or meet qualifications. Leland Noble does not meet the qualifications for this new position, as he does not have a college degree. I was disqualified for not having a degree when I applied for the [plant manager] position in 2004. I stated I have no interest in the Manager position this time but these positions should have been posted like every other position ever was, requiring same qualifications. Also, our department started using interview panels last year which obviously was not done this time either. *Bypassing normal hiring protocol, especially after management was alerted to issues with Mr. Noble magnifies this hiring action.* I find it disturbing that the Town Manager would promote someone that is clearly responsible for the present working conditions of having to work in an environment of possible retaliation which include hostilities in the workplace, the very same person that put pressure on me to hide violations, of which I refused to do.

(Emphasis added.)

In short, Mayhew may have had personal reasons for saying some of what he said, but his allegation that Smyrna failed to follow its own hiring policies when it allegedly promoted two unqualified individuals—one being the subject of Mayhew's complaints, and the other the decisionmaker's nephew who was complicit in Noble's illegal activities—reflects his "communications were not made *merely* for personal reasons." *Handy-Clay*, 695 F.3d at 544 (emphasis added); *see also Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 388, 895 (6th Cir. 2003)

(holding complaints about "favoritism/nepotism in hiring, the lack of posting and interviewing for job vacancies, and the improper certification of staff" were speech on matters of public concern).

Defendants resist this conclusion by arguing Mayhew's statements went solely up the chain of command, and that he did not allege any violations of the law when raising concerns about the hiring practices. It is on this primary basis they distinguish *Banks*, contending (as did the district court) that our statement in *Banks* about reporting nepotism and violations of hiring protocol being matters of public concern are distinguishable because, there, the plaintiff reported out to a state agency about violations of state law. 330 F.3d at 896–97. But we have never drawn such a narrow distinction when examining the public-concern prong because "constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public." *Handy-Clay*, 695 F.3d at 544 (citation omitted). Nor must courts limit reports of wrongdoing to illegal acts, for a public concern includes "*any* matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146 (emphasis added).

For these reasons, the district court erred in holding Mayhew's complaints regarding Smyrna's promotions practices did not constitute speech about a public concern.

VI.

Accordingly, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.[2]

---

[2]Defendants did not contest below (or on appeal) Mayhew's contention that (a) Noble's misconduct constituted a matter of public concern, and (b) his complaints regarding Smyrna's hiring practices were made in his capacity as a private citizen. Nor did defendants assert that, under the *Pickering* balancing test, their interests would nonetheless trump Mayhew's protected conduct. Having failed to preserve these issues for appellate review, we express no opinion on them.