**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0579n.06

Case No. 19-2333

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 09, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| GARRETT DEWYSE, | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| WILLIAM L. FEDERSPIEL, HEATHER | ) | MICHIGAN |
| BEYERLEIN, and COUNTY OF SAGINAW, | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |

**BEFORE:  SUHRHEINRICH, LARSEN, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge**.  While working as a deputy in the Saginaw County Sheriff's Department, Garrett DeWyse was asked to compile financial information for an annual report.  That assignment led DeWyse to discover the possible misuse of public funds.  Yet when he informed the County Finance Director of his concerns, DeWyse alleges that he was demoted and reprimanded, prompting him to file a First Amendment retaliation claim under 42 U.S.C. § 1983.

Because DeWyse's communications were made as part of his duties as a public employee, his speech is not entitled to First Amendment protection.  We accordingly **AFFIRM** the decision awarding summary judgment to Defendants.

**BACKGROUND**

Saginaw County Detective John Butcher seized $22,583 in cash from Pierre Najjar during a narcotics investigation. When Najjar agreed to pay the Saginaw County Sheriff's Department the money seized from him in lieu of entering formal civil forfeiture proceedings, Butcher delivered the money to Garrett DeWyse, the Department's property and evidence room manager.

A few weeks later, Butcher asked DeWyse to release $2,000 of those funds to pay for confidential informants and controlled-substance buys. Believing the request was improper, DeWyse refused. But following Lieutenant Randy Pfau's order to DeWyse to release the money, DeWyse did so. Over the next year, Butcher returned to the property room to make similar withdrawals from the Najjar funds until they were depleted. For each disbursal, both DeWyse and Butcher signed a "chit sheet" documenting the date and amount withdrawn. As the funds became depleted, Pfau, Butcher, DeWyse, and Koren Reaman, the Finance Director in the Controller's Office, met to discuss Butcher's use of the funds.

Sometime later, Sheriff William Federspiel asked DeWyse to compile information for an annual report to the State of Michigan related to the Department's 2015 civil forfeiture activities. The Department's Undersheriff, who ordinarily would have prepared the report, was out sick. In the Undersheriff's absence, Federspiel asked DeWyse to "get some information" related to the prior year's forfeitures and communicate with the Controller's Office as needed.

While compiling information for the report, DeWyse came to believe the Najjar funds had been mishandled. From his own research, DeWyse understood that civil forfeiture funds must "be deposited with the treasurer" or "the general municipality." Yet the Najjar funds, to his mind, were "off the books," meaning they would not be accounted for in the annual report. DeWyse became "afraid that being a part of this process" would "reflect poorly on [him]," as the report

"would not balance" out the forfeiture data. He also came to believe that Butcher's actions were illegal.

DeWyse arranged a meeting with Reaman. During the meeting, DeWyse disclosed that the Najjar funds had been completely withdrawn. DeWyse did not describe to Reaman the process by which Butcher had withdrawn the funds because he knew Reaman was already aware that the Department was using the funds for controlled buys.

DeWyse alleges that he was reprimanded for speaking with Reaman about the Najjar funds. His punishment included being demoted from his role in the property room as well as a verbal admonishment by Federspiel. DeWyse eventually left the Department for a position with a different police agency.

DeWyse then filed a First Amendment retaliation claim against Saginaw County, Federspiel, and the Administrative Sergeant. Following discovery, the district court granted summary judgment to Defendants. The court determined that DeWyse spoke to Reaman in his capacity as a public employee rather than as a private citizen, meaning DeWyse's speech, as a matter of law, was undeserving of constitutional protection. *DeWyse v. Federspiel*, 421 F. Supp. 3d 499, 507 (E.D. Mich. 2019). This appeal followed.

## ANALYSIS

*Standard of Review.* We review the district court's grant of summary judgment de novo. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 461 (6th Cir. 2017). Defendants are entitled to summary judgment if there is no genuine dispute as to any material fact and DeWyse's claims fail as a matter of law. *See* Fed. R. Civ. P. 56(a). At this stage, we consider the evidence and all reasonable inferences in DeWyse's favor. *Haddad v. Gregg*, 910 F.3d 237, 243 (6th Cir. 2018).

*First Amendment Retaliation.* To state a First Amendment retaliation claim, DeWyse must show that (1) his speech was constitutionally protected; (2) the County took adverse action against him that would deter a person of ordinary firmness from continuing to engage in that speech; and (3) a causal connection exists between the first two elements. *See Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Because DeWyse was a public employee at the time he engaged in the speech at issue, to establish the threshold requirement that his speech was protected, he must also demonstrate that (1) he spoke on a matter of public concern; (2) he spoke as a private citizen rather than as an employee pursuant to his official duties; and (3) his speech interest outweighs the government's interest, as an employer, in promoting efficient public service through its employees. *Mayhew*, 856 F.3d at 462. Whether an employee engaged in constitutionally protected speech is a question of law. *Id.* at 464.

DeWyse contends he was exercising his First Amendment rights when he communicated about the allegedly misappropriated funds with Reaman, the County Finance Director. Whether that communication was constitutionally protected speech turns on whether DeWyse spoke as a private citizen or a public employee. The district court held that DeWyse did so as a public employee, meaning the First Amendment did not protect his speech. *DeWyse*, 421 F. Supp. 3d at 507. As that holding was dispositive of DeWyse's claim, the court did not analyze any other issue before it. *Id.* We opt to cabin our analysis to that same narrow question.

When speaking as a private citizen, the First Amendment protects a public employee's right to address matters of public concern. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). By the same token, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

*Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). At issue in *Garcetti* was an investigation by Richard Ceballos, a deputy district attorney, into potential inaccuracies in an affidavit used to support a search warrant. *Id.* at 413–14. Concerned about what his investigation uncovered, Ceballos wrote to his supervisors to question the sufficiency of the affidavit and recommend that the case be dismissed. *Id.* Ceballos subsequently experienced several adverse employment actions, allegedly because he voiced dissent about the prosecution. *Id.* at 415. Yet when he later pursued a First Amendment retaliation claim against his supervisors, the claim failed. Because communicating with his supervisors about pending cases was part of Ceballos's official duties, he spoke pursuant to his role as deputy rather than as a private citizen, meaning the First Amendment did not stand in the way of his employer's disciplinary action. *Id.* at 421–22.

The Supreme Court later clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). In *Lane*, a community college employee was compelled by subpoena to testify at a public corruption trial regarding information he learned on the job. *Id.* at 231–33. The plaintiff was later fired by the college. *Id.* at 233. Believing his termination was the result of his trial testimony, the plaintiff brought a First Amendment retaliation claim against his employer. *Id.* at 234. But unlike in *Garcetti*, the plaintiff's speech was entitled to First Amendment protection. Although the speech "concern[ed] information learned in the course of public employment," the plaintiff's "official responsibilities," the Supreme Court explained, nonetheless did not include testifying at criminal trials. *Id.* at 239.

With these holdings in mind, to decide whether DeWyse spoke as a public employee, we must evaluate whether his communication about the allegedly mishandled funds was "made pursuant to his job duties or whether [it] merely relayed information he learned while on the job

in a way that did not affect his duties." *Fledderjohann v. Celina City Sch. Bd. of Educ.*, --- F. App'x ---, 2020 WL 5049346, at *4 (6th Cir. Aug. 27, 2020). Our approach to that inquiry "is a practical one." *Mayhew*, 856 F.3d at 464 (quoting *Garcetti*, 547 U.S. at 424). Relevant factors include the speech's impetus, its setting, its audience, and its general subject matter. *Haddad*, 910 F.3d at 247.

Starting with the impetus for DeWyse's speech, the genesis primarily appears to have been his concern over his professional reputation. According to DeWyse, he worried the discrepancy in the Department's financial data would "reflect poorly" on him because he was "part of [the] process" of removing the funds from the property room. In that respect, his speech was animated far more by his role as an employee than as a member of the public at large.

The setting (a meeting to discuss the County Sheriff's Department's financial practices) and audience (the County Financial Director) for DeWyse's speech are to the same effect. To be sure, Reaman was not one of DeWyse's supervisors, and "[s]peech outside the chain of command is less likely to be within an employee's ordinary job responsibilities." *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019) (holding that a public fiscal coordinator plausibly pleaded that her ordinary job duties did not include reporting internal misconduct to an outside institution). But most significant here is not DeWyse's "chain of command, but rather whether [he] communicated pursuant to his . . . official duties." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007). Because DeWyse acknowledged he was instructed to speak with Reaman as part of his job duties, these factors also reflect that DeWyse spoke as a public employee.

And then consider the subject matter of DeWyse's communication to Reaman: the Department's forfeiture funds. The pair's discussion focused on the data DeWyse compiled for

the Department's annual report. Because Reaman was already aware of Butcher's use of the Najjar funds, DeWyse did not address how or why the funds had been withdrawn.

It makes no difference whether DeWyse communicated with Reaman in the context of the special audit role Federspiel assigned him rather than in his customary role as property room manager. To the extent that assignment placed upon DeWyse temporary or "ad hoc" duties, it remains true that "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description." *Weisbarth*, 499 F.3d at 544; *see also Henderson v. City of Flint*, 751 F. App'x 618, 623–24 (6th Cir. 2018) (finding that a city administrator urged investigation of mayor's conduct in part pursuant to her ad hoc and de facto duties). For instance, in *Weisbarth*, a park ranger alleged that comments she made to a consultant retained by her employer during a ride-along unlawfully led to her dismissal. 499 F.3d at 540. Although answering the consultant's questions was not part of the park ranger's official duties, her comments were part of an "ad-hoc" duty that arose in the course of her employment, meaning she spoke as a public employee for First Amendment purposes. *Id.* at 543–44.

Much the same is true for DeWyse. Although his regular duties involved managing the property room, he was asked to prepare the audit report because the Undersheriff was unavailable to do so. As DeWyse explained during his deposition, in taking on that ad hoc assignment, he took on the duty of communicating with Reaman as needed regarding the report:

> Q: Okay. So you, in addition to what you typically did on an annual basis, also gave this information to Koren Reaman regarding the year-end report, correct?
>
> A: Fair statement.
>
> Q: And you were directed to that by the sheriff?
>
> A: Correct.

Today, DeWyse takes a narrower view of those duties. His task, he says, was simply "to compile *numbers*" for the report, and not to "*report* the illegal off-the-books retention (and use) of ill-gotten funds" to Reaman. Indeed, he adds, "[h]e was *never* asked, directed, or tasked to take" such information to Reaman. It follows, he says, that his communications about the civil forfeiture funds were made independently from his assigned duties. In one sense, DeWyse is correct; his assignment did not explicitly include the obligation to report alleged corruption. But as the district court noted, there is no evidence that DeWyse affirmatively told Reaman that Department officials were engaged in illegal activity. *DeWyse*, 421 F. Supp. 3d at 502. DeWyse simply told her that the Najjar funds had been completely withdrawn, largely to address DeWyse's concern that his audit "would not balance" with the previous year's data, which would reflect poorly on him. Because Reaman attended a prior Department meeting during which the use of these funds was discussed, DeWyse acknowledged that Reaman "already knew what was going on" with Butcher's withdrawals.

Our recent decision, *Mertins v. City of Mount Clemens*, 817 F. App'x 126 (6th Cir. 2020), does not counsel otherwise. There, a city finance department employee discovered the city was overbilling residents for utilities. *Id.* at 127. Yet when the employee raised the issue with her supervisors, she was subjected to reprimands and harassment. *Id*. at 128. The employee then raised these same concerns with her union, local prosecutors, the FBI, and city commissioners. *Id.* At the same time, she continued to face discipline from her supervisors. *Id.* The employee eventually filed a First Amendment retaliation claim against her supervisors, and we later reversed the district court's grant of summary judgment for the defendants. *Id.* at 129, 132. Relying on prior decisions addressing communications with the FBI about corruption, *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007), and speech connected to union activities, *Boulton v. Swanson*,

795 F.3d 526, 534 (6th Cir. 2015), we held that the employee's speech to her union, local and federal law enforcement, and city commissioners were instances of private speech. *Id.* at 131. But unlike the employee's speech in *Mertins*, DeWyse's communications were not made to outside law enforcement officials or his union. Likewise, although the parties disagreed in *Mertins* whether the employee was authorized to perform an audit, there is no dispute that DeWyse was instructed to compile information related to civil forfeiture funds and to share that information with Reaman. *Mertins*, then, is a poor guide for today's case.

*     *     *     *     *

In reaching this outcome, we do not question DeWyse's motivation, nor do we condone disciplining public employees for raising concerns about government mismanagement or corruption. *See Mayhew*, 859 F.3d at 466. But in this public employment setting, laudable intent alone is not enough to secure First Amendment protection. *See Haddad*, 910 F.3d at 249–50. As DeWyse's communications fell within the scope of his employment and were made pursuant to his assigned duties, he spoke as a public employee, meaning his speech is unprotected.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.

9