RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0259p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

DAVID HADDAD,

     *Plaintiff-Appellant*,

  *v.*

RANDALL GREGG; JEAN BOVEN; MICHIGAN DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES,

     *Defendants-Appellees*.

No. 18-1660

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
16-cv-01190—Janet T. Neff, District Judge.

Decided and Filed: December 3, 2018

Before: SILER, ROGERS, and COOK, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** DJ Pascoe, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. David Haddad, Lansing, Michigan, pro se.

─────────────────

**OPINION**

─────────────────

PER CURIAM. David Haddad sued under 42 U.S.C. § 1983 alleging he was terminated by his employer, the Michigan Department of Insurance and Financial Services ("MDIFS"), for exercising his First Amendment rights. The district court granted summary judgment in favor of Defendants, and Haddad appeals, proceeding pro se. The district court's opinion thoroughly and correctly addresses the issues raised by Haddad on appeal. We uphold the district court's

judgment for the reasons given by the district court.  The opinion and order of the district court is attached as an appendix to this opinion.  We also briefly address an argument Haddad raises for the first time on appeal.

In dismissing Haddad's First Amendment retaliation claim, the district court concluded that Haddad was not acting as a private citizen, and thus was not entitled to First Amendment protection.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Haddad argues for the first time on appeal that he was acting as a "virtual private citizen" because his duties as an examiner for MDIFS required him to speak in the public interest and work to end the inclusion of intra-family exclusion clauses ("IFEs") in insurance policies.  By making this argument, however, Haddad acknowledges that he was acting pursuant to his official duties when he sought to end the use of IFEs through his examinations, the very activity that he claims was the basis for his termination. He further acknowledges that he reached out to attorneys at the Sinas Dramis law firm in order "to learn about no-fault claims and lawsuits, so as to better serve the public," which would relate to ongoing or upcoming examinations.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*.  The district court concluded that Haddad was not acting as a private citizen because his desire to thwart the inclusion of IFEs in insurance policies was part of his job as an examiner and he had used his communications with the Sinas Dramis law firm to further an official investigation. Haddad reinforces this conclusion on appeal by acknowledging that his purpose for reaching out and communicating with the Sinas Dramis law firm regarding IFEs was to further his official work to end what he believed to be an unfair insurer practice.  Accordingly, his conduct was part of the performance of his job, and the district court did not err by concluding that Haddad was not speaking as a private citizen. *See Mayhew v. Town of Smyrna*, *Tenn.*, 856 F.3d 456, 464-65 (6th Cir. 2017); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543-46 (6th Cir. 2007).

Accordingly, we **AFFIRM** the district court's judgment.

---

**APPENDIX**

---

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID HADDAD,

    Plaintiff,                                               Case No. 1:16-cv-1190

v.                                                                 HON. JANET T. NEFF

RANDALL GREGG, et al.,

    Defendants.

_____/

**OPINION AND ORDER**

Plaintiff filed this action alleging civil rights claims under 42 U.S.C. § 1983 against his former employer Defendant Michigan Department of Insurance and Financial Services (DIFS) and two individual Defendants: Randall Gregg, DIFS Director of the Office of Legal Counsel; and Jean Boven, DIFS Director of Insurance Licensing and Market Conduct Director.

Defendants filed a Motion for Summary Judgment Pursuant to FED. R. CIV. P. 56 (ECF No. 38); Plaintiff filed a Response (ECF No. 42); and Defendants filed a Reply (ECF No. 41). Having fully considered the parties' briefs and accompanying exhibits, the Court concludes that oral

argument is unnecessary to resolve the Motion. *See* W.D. Mich. LCivR 7.2(d). The Court grants

Defendants' motion.

## I. FACTS[1]

Plaintiff took a position as an Examiner for the former Office of Financial Insurance

Regulation, now DIFS, in May 2011. During the course of his employment, Plaintiff's central

function was to perform Market Conduct Exams (MCEs) to look at the practices and procedures

of a company to see whether it is engaging in potentially unfair business practices in dealing with

insurance consumers. During the course of an MCE, information submitted is confidential. Once

the report is approved by the Market Conduct Director, the report is made available to the public

on DIFS' website. An Examiner is free to publicly discuss the information in the report, including

the identity of the insurer that was examined, once it is made public.

During the course of his MCE of Progressive Marathon Insurance Company's no-fault

benefit payments during 2013, Plaintiff encountered the company's exclusion, referred to as the

"intra-family exclusion" (IFE), that placed a substantial cap on the benefits a victim receives if a

family member is driving, significantly lowering payment for pain and suffering benefits.

Believing the IFE to be deceptive, and questioning whether it was legal, Plaintiff undertook efforts

to educate himself about the IFE, first within DIFS, and then through outside sources, eventually

conferring with attorneys Steve and George Sinas at the Sinas Dramis law firm, who represent

---

[1] The parties failed to file a Joint Statement of Material Facts, as ordered by the Court (ECF No. 30 at PageID.193). The background facts are taken primarily from Plaintiff's Response brief (ECF No. 42 at PageID.421-433) for purposes of this motion, recognizing that the summary judgment standard requires that the facts and all inferences therefrom be viewed in a light most favorable to the non-moving party, i.e., Plaintiff. Defendants do not contest any statements of fact in Plaintiff's Response (see Reply, ECF No. 41). Record citations to exhibits are omitted since the Court is unable to identify exhibits from the parties' references, particularly where they cannot be deciphered because the exhibits were copied four to a page (*see*, *e.g.*, ECF Nos. 40-8, 40-12).

plaintiffs against insurance companies. Plaintiff attended several of the firm's People's Law School presentations and met with Steve Sinas at a local sports bar to discuss no-fault law. Plaintiff's investigation of the IFE included internal emails with coworkers, and email correspondence and discussions with attorney Steve Sinas concerning the exclusion and MCEs conducted by DIFS.

Ultimately, after Defendant Boven became aware that Plaintiff was questioning the legality of the IFE, she and Defendant Gregg began a 3-4 week investigation of Plaintiff's activities. Boven and Gregg interviewed Plaintiff on June 25, 2015. Before questioning him, Gregg and Boven asked Plaintiff to sign a "*Garrity* form." The "*Garrity* form" advised Plaintiff of his *Garrity* rights, and in particular stated that "[a]ny statements made by you during these interviews, or the fruits thereof, cannot be used against you in any subsequent criminal proceeding."

On July 9, 2015, DIFS, on Defendant Gregg's recommendation, issued its Notice of Charges and Disciplinary Action to Plaintiff, terminating his employment. DIFS claimed that Plaintiff was terminated for violation of DIFS policy T-5, "Information Privacy and Security Handling," DIFS Policy G-3, "Confidentiality and Oath of Office," DTMB Policy 13.40.00, "Information Technology Information Security," and Civil Service Rules 2-8, 2-8.1 and 2-8.2, "Ethical Standards of Conduct."

Plaintiff thereafter filed this action based on his alleged wrongful termination. Plaintiff's Complaint alleges two counts under § 1983: Count I, Violation of the Fifth Amendment, Compelled Self Incrimination; and Count II, First Amendment Retaliation.

## II.  LEGAL STANDARDS

Defendants move for summary judgment under Rule 56. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson*, 477 U.S. at 251-52).

## III.  ANALYSIS

"To establish a claim under 42 U.S.C. § 1983, 'a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Scott v. Kent Cty.*, 679 F. App'x 435, 438 (6th Cir. 2017) (quoting *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013)). Plaintiff asserts constitutional claims based on First Amendment retaliation and based on

a *Garrity* violation under the Fifth Amendment. The Court's analysis addresses the law and arguments as presented by the parties.

## A. Official Capacity Claims

Defendants argue as an initial matter that Plaintiff's claims against Defendant DIFS and Defendants Gregg and Boven in their official capacities fail as a matter of law because they are not "persons" for purposes of § 1983. Plaintiff fails to address this argument.

It is well-settled that "neither a State nor its officials acting in their official capacities are "persons" under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Defendant DFIS and Defendants Gregg and Boven, in their official capacities, are entitled to summary judgment.

## B. First Amendment Claim

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. §1983, a plaintiff must demonstrate that: "(1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (citing *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003) (citations omitted)).

Defendants argue that Plaintiff cannot establish: (1) that he was engaged in a constitutionally protected activity, since he was not speaking as a private citizen; or (2) that his speech was a substantial or motivating factor in his termination (ECF No. 39 at PageID.215). Therefore, Plaintiff cannot establish that he was terminated for exercising his First Amendment rights.

1. Constitutionally Protected Activity

"'[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.'" *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (emphasis in *Mayhew*)). While it has been "long 'settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,'" *Connick v. Myers*, 461 U.S. 138, 142 (1983), such protections must be construed in balance with the efficient functioning of government services. *Mayhew*, 856 F.3d at 461-62. Thus, an individual's First Amendment rights as a public employee are narrower than those of the citizenry at large. *Id.* (citing, e.g., *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). These considerations dictate the legal hurdles for First Amendment claims advanced by public employees.

To show he was engaged in constitutionally protected activity, a public employee alleging First Amendment retaliation must satisfy three requirements:

> First, the employee must speak on "matters of public concern." *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010) (citing *Connick*, 461 U.S. at 143 []). Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id.* at 338 (citing *Garcetti*, 547 U.S. at 421 []). Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering*, 391 U.S. at 568 []).

*Mayhew*, 856 F.3d at 462. The question whether a public employee's speech is protected is a question of law for the court to decide. *Id.* at 462-464.

Plaintiff's Complaint asserts the following protected activity:

a.      In the past, advocating within DIFS that it should express opposition to insurer policies and practices that were deceptive and unlawful,

b.      Contacting Executive Liaison Basso and attempting to influence him to, as a matter of DIFS policy, oppose the lawfulness of the Intra Family no-fault Bodily Injury exclusion,

c.      Writing his coworkers at DIFS and calling upon them to "muster their collective will" to oppose the IFE as unlawful and deceptive, []

d.      Setting out to examine other insurers known to use the IFE and calling upon them to conspicuously disclose the exception [so] that they did so, and

e.      Sharing his opinion with Attorney Sinas that he believed the IFE was unlawful and deceptive, and his belief that DIFS should "muster its collective will" to oppose it.

(ECF No. 1 at PageID.26-27).

Plaintiff further asserts that he exercised his First Amendment right of freedom of association by:

a.      Attending the People's Law School to learn about Michigan no-fault law related to the Progressive Insurance MCE,

b.      Discussing Michigan law, the no-fault act, and the IFE with Attorneys Steve and George Sinas,

c.      Receiving and reading materials from Attorney Steve Sinas pertaining to how insurance companies have "snuck into their policies" to wrongfully deny and limit benefits by including an IFE,

d.      Revealing the results of the Progressive MCE that had been made public and commenting on the results,

e.      Expressing his opinion that the IFE was deceptive and unlawful to Steve and George Sinas,

f.      Expressing his opinion that DIFS should "muster its collective will" to oppose the IFE to Steve Sinas.

(*Id.* at PageID.28-29).

Having considered the parties' arguments and the authority presented, the Court concludes that Plaintiff's First Amendment claim falls short under the framework set forth in *Mayhew*.

"'While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions.'" *Farhat*, 370 F.3d at 588 (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (internal citations omitted)). The circumstances presented in this case, although somewhat unique, persuade the Court that Plaintiff's speech and other activities underlying his termination were properly subject to control by Defendants as an employer, rather than within the ambit of conduct protected by the First Amendment. Even if Plaintiff's speech or conduct, or portions thereof, were subject to the protections of the First Amendment, Plaintiff has failed to show that such conduct was a "substantial" or "motivating factor" in the adverse actions taken against him.

a.  Private Citizen Speaking on a Public Concern

"In order for a government employee's speech to warrant First Amendment protection, the Supreme Court's *Connick* and *Pickering* decisions have long imposed the threshold requirements that the employee (1) must have spoken 'as a citizen,' and (2) must have 'address[ed] matters of public concern.'" *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). "The Supreme Court clarified the first of these requirements in *Garcetti*, [547 U.S. at 421], by holding that 'when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes.'" *Weisbarth*, 499 F.3d at 542 (emphasis in *Weisbarth*).

In *Garcetti*, the respondent Ceballos was employed as a deputy district attorney for the Los Angeles County District Attorney's office. 547 U.S. at 413. Ceballos was contacted by a defense attorney on a pending criminal case, who told Ceballos there were inaccuracies in an affidavit used to obtain a critical search warrant. *Id.* Ceballos conducted an investigation, visiting the location

described and speaking with the warrant affiant. *Id.* at 414. Based on his investigation, Ceballos believed the search warrant contained serious misrepresentations, and he conveyed his findings to his supervisors, following up with a disposition memorandum that recommended dismissal of the case. *Id.* at 414, 420; *see also Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015). A joint meeting was scheduled to discuss the affidavit with the sheriff's department, in which one lieutenant sharply criticized Ceballos for his handling of the case. *Garcetti*, 547 U.S. at 414. Cebellos' supervisor decided to proceed with the prosecution, and Ceballos was called by the defense to testify at a hearing in the trial court. *Id.* at 414-15. The trial court rejected the challenge to the warrant. *Id.* at 415.

Ceballos claimed that in the aftermath of these events, he was subjected to a series of retaliatory employment actions, including reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion. *Id.* "Ceballos initiated an employment grievance, but the grievance was denied based on a finding that he had not suffered any retaliation." *Id.* Unsatisfied, Ceballos sued in federal court alleging a First Amendment retaliation claim. *Id.*

The *Garcetti* Court rejected Ceballos' First Amendment claim, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. The Court found that the fact that Ceballos expressed his views inside his office, rather than publicly, or that the memo concerned the subject matter of Ceballos' employment was not dispositive. *Id.* at 421-22. The controlling factor was that Ceballos' expressions were made pursuant to his official duties as a calendar deputy. *Id.* at 421. The Court contrasted the expressions made by the speaker in *Pickering*,

a teacher whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day. *Id.* at 422. However, the Court noted that because it was undisputed that Ceballos wrote the memo pursuant to his employment duties, the Court had no occasion for articulating a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. *Id.* at 424.

Defendants argue that based on *Garcetti* and the relevant case law, Plaintiff cannot show he was speaking as a private citizen. His speech to, and association with, individuals outside of DIFS dealt specifically with how DIFS would regulate insurance companies doing business in Michigan (ECF No. 39 at PageID.218). These issues are squarely within the official job functions assigned to Plaintiff (*id.*). Thus, Plaintiff cannot sustain his First Amendment retaliation claim even if he was speaking on a matter of public concern (*id.* at PageID.218-219).

"Determining whether an employee speaks as a private citizen or as a public employee can be challenging." *Mayhew*, 856 F.3d at 464 (citing *Boulton*, 795 F.3d 533). "'The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'" *Id.* at 463 (quoting *Lane v. Franks*, U.S. ____ 134 S. Ct. 2369, 2379 (2014) (emphasis omitted)). Although the Supreme Court has not identified any detailed analysis to decide this question, "the 'proper inquiry is a practical one.'" *Mayhew*, 856 F.3d at 464 (quoting *Garcetti*, 547 U.S. at 424). Further, the public employee exception to First Amendment protection "'must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment.'" *Mayhew*, 856 F.3d at 464 (quoting *Boulton*, 795 F.3d at 534). The Sixth Circuit has utilized several non-exhaustive factors to assess an employee's statement, including the speech's impetus; its setting; its audience;

and its general subject matter—"who, where, what, when, why, and how" considerations. *Mayhew*, 856 F.3d at 464 (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012)).

This case presents a particularly fine line in deciding whether Plaintiff's speech and conduct emanated from his ordinary responsibilities. While the parties each attempt to align this case with decisions in other cases, the Court finds none of the parties' cited cases directly on point.

Defendants rely on *Omokehinde v. Detroit Board of Education*, 563 F. Supp. 2d 717 (E.D. Mich. 2008), as "highly instructive" (ECF No. 39 at PageID.216). The plaintiff was a former school district employee who helped monitor the school district's expenditure and disbursement of certain federal funds. *Omokehinde*, 563 F. Supp. 2d at 720. After informing her supervisor that she believed the school district was using federal funds for improper purposes, and receiving no response, the plaintiff expressed her concerns in an anonymous letter to a reporter for the Detroit Free Press, which published an exposé on misconduct in the school district. *Id.* at 721. The plaintiff was discharged a short time later and brought suit claiming she was discharged for speaking out as a private citizen. The court disagreed, holding that the plaintiff's anonymous letter to the paper was not protected speech:

> Plaintiff's complaints to her supervisor about questionable Title I expenditures flowed directly from her duties and responsibilities as an employee of the Defendant School District. When her protests through the chain of command proved unavailing, she repeated precisely the same complaints to an outside audience. This Court fails to see how the broader dissemination of precisely the same speech alters the fundamental nature of the underlying communication, such that what was once a part of the employee's official duties becomes the speech of a private citizen.

*Id.* at 728.

Defendants similarly cite *Meggison v. Charlevoix County*, No. 1:07-CV-577, 2009 WL 5411896 at *5, *8 (Dec. 23, 2008) (unpublished), in which the court determined that the statements

of a jail administrator addressing jail air quality concerns did not qualify as private citizen speech under *Garcetti*. Like the plaintiff in *Omokehinde*, the plaintiff took internal complaints to a public audience, speaking at a county board of commissioners meeting and meeting with a reporter. *Id.* at \*3. The court observed that the entire subject matter of the plaintiff's speech owed its existence to her professional responsibilities and role as Jail Administrator. *Id.* at \*5-6. The plaintiff's decision to disseminate her employment grievances to a wider audience did not cloak those grievances with First Amendment protection. *Id.* at \*8. The court noted that the plaintiff was not "an average citizen who happens to be a public employee." *Id.* Instead, her extensive knowledge of the air quality issue about which she spoke was a direct result of her job. *Id.*

Defendants argue that *Omokehinde* and *Meggison* are consistent with Sixth Circuit case law. For example, in *Weisbarth*, the Sixth Circuit held that statements made by a park ranger to a consultant hired by her employer were not protected by the First Amendment. 499 F.3d 538. The plaintiff in *Housey v. Macomb County*, 534 F. App'x 316, 322 (6th Cir. 2013), made a similar argument—that he was speaking as a private citizen when he reported the misconduct of a probate judge "over whom he had no authority vis-à-vis his job duties" to the State Court Administrative Office and the Judicial Tenure Commission, because his "purely administrative" job duties did not include such reporting. The Court rejected the plaintiff's argument, holding that his reports arose from his duty to oversee the efficient administration of the Macomb County Probate Court as the Court Register, and were not the type of activity engaged in by private citizens. *Id.* at 323. His reports and communications owed their existence to his responsibilities as a probate court register. *Id.* That is, the plaintiff's speech "had a measure of 'official significance'" because of his duty to ensure the court was functioning properly. *Id.* (quoting *Garcetti*, 547 U.S. at 422).

Defendants argue that, as was true in *Meggison*, Plaintiff was not "an average citizen who happens to be a public employee" (ECF No. 39 at PageID.218). In other words, he was not the typical private citizen speaking to individuals about the regulation of the insurance industry. To the contrary, he had extensive knowledge of the issues on which he spoke—knowledge based on his employment and unique knowledge gleaned from his position as a DIFS Examiner. Thus, Plaintiff's speech was not private citizen speech and is not entitled to constitutional protection.

Plaintiff cites cases to the contrary. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378 (1987). In *Rankin*, a clerical employee in a county constable's office was fired after making a statement to another employee, apparently her boyfriend, which expressed an opinion about policies of the President's administration (see ECF No. 42 at PageID.434). The *Rankin* Court held that such a political statement addressed a matter of public concern and was subject to First Amendment protection. *Rankin*, 483 U.S. at 387-88. It also applied the *Pickering* balancing test and held that the State's interest in maintaining a peaceful and cohesive workplace did not outweigh the employee's right to express political opinions while at work. Plaintiff asserts that, similarly, the right to free association applies to State employees while at work, *Monks v. Marlinga*, 923 F.2d 423, 425 (6th Cir. 1991). *See Rankin*, 483 U.S. at 389-92. Plaintiff argues that he had a right to express opinions at work and to associate with persons and organizations outside of DIFS, and these rights survive Defendants' challenge under the *Pickering* balancing test (ECF No. 42 at PageID.435).

Plaintiff further argues that *Garcetti* does not mandate a different result simply because Plaintiff's activities were taken in the course and scope of his employment with DIFS (*id.*). The *Garcetti* Court noted that the fact that the plaintiff expressed his views inside his office rather than publicly was not dispositive. *See Garcetti*, 547 U.S. at 420. Moreover, the *Garcetti* Court cited

*Rankin* with approval; thus, the holding in *Garcetti* cedes to *Rankin*'s protection of a public employee's right to express political opinion while at work (ECF No. 42 at PageID.435).

Finally, Plaintiff notes that although Defendants attempt to align this case with those in which the speech or association was viewed as a "continuation" of work duties, Defendant Boven's comment that Plaintiff was "going to take an issue beyond what he's authorized to do" casts doubt on the theory that Plaintiff's activities were entirely within the scope of his State employment (ECF No. 42 at PageID.435). Plaintiff asserts that his speech at issue all "centered around" his expression of his *opinion* that the IFE was "unlawful" and "deceptive" (*id.* at PageID.435-436). And Boven's stated concerns "boil down to animus toward[] him for expressing opinions with which she, and the powers-that-be at DIFS, did not agree" (*id.* at PageID.436).

The parties each advance arguments grounded in proper First Amendment analysis. However, having considered the underpinnings of the Supreme Court's First Amendment analysis and more recent binding Sixth Circuit precedent, the Court is persuaded that Plaintiff's conduct falls outside the realm of recognized "private citizen" speech and activity ordinarily afforded First Amendment protection.

First, as Defendants point out, *Rankin*, on which Plaintiff largely relies, can be distinguished. There, the expression involved a data-entry employee in a county constable's office, who was fired for remarking in a private conversation with a co-worker, after hearing of an attempt on the President's life, "if they go for him again, I hope they get him." *Rankin*, 483 U.S. at 381. The statement was made in the context of discussing the policies of the President's administration, with her boyfriend/coworker, and right after a news bulletin of an attempt on the President's life, "a matter of heightened public attention." *Id.* at 381, 386. The Court thus found the statement plainly dealt with a public concern. *Id.* at 386.

*Rankin* did not expressly address the "private citizen" aspect of protected First Amendment speech and does not further Plaintiff's case. Here, Plaintiff was addressing the very regulatory issues he was tasked with dealing with daily in his employment as an Examiner for DIFS. Plaintiff acknowledges that his "central function" at DIFS was to perform Market Conduct Exams to look at the practices and procedures of an insurance company to see whether it is engaging in potentially unfair business practices in dealing with consumers (ECF No. 42 at PageID.421). In the course of that job task in the Progressive MCE, Plaintiff discovered the IFE and "took umbrage" to the exclusion "[b]ecause I would not want to see any poor parent get denied BI benefits to their child because they think they might – she might have driven into a tree on purpose. I would not want to see that happen to anybody" (ECF No. 42 at PageID.422-423, citing Ex. 13, Haddad Dep. at 127:17-21).

Plaintiff then began his extensive investigation, which ultimately resulted in his termination. Plaintiff states that he first followed protocol, asking the Office of General Counsel and several other DIFS staffers to provide him with a no-fault expert. When he was told that no no-fault experts were available, he pursued his investigation outside DIFS channels, eventually consulting with the Sinas Dramis law firm and attending their "People's Law School" (ECF No. 42 at PageID.423). He discussed the IFE with attorney Steve Sinas, who expressed his opinion that IFEs were "really unfair" (*id.* at PageID.424).

Viewed from a practical standpoint, the Court concludes that Plaintiff's activities were in furtherance of the ordinary responsibilities of his employment. Here, Plaintiff used his investigation, and presumed validation that IFEs were deceptive and contrary to Michigan law, to press this point in the examination process of Progressive, which willingly agreed to make more

prominent disclosures of the provision, and its potential ill effects, to its insureds. Thus, Plaintiff's conduct was directly in the course of the performance of his job, and not as a private citizen.

The Court's conclusion does not ignore that Plaintiff's mission may have been motivated by his perceived public interest purpose. But however laudable, Plaintiff's quest to have the IFE prohibited as deceptive and unfair to insurance consumers was taken in his role as a Market Conduct Examiner, subject to the controls of DIFS as his employer. *See Mayhew*, 856 F.3d at 465 (noting, but rejecting, the plaintiff's argument that his complaints about a superior's questionable conduct with respect to the city's wastewater treatment "were borne of out of his civic and 'moral responsibility,' not his job functions"). As the Court initially explained in *Garcetti*: "'Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Boulton*, 795 F.3d at 532-33 (quoting *Garcetti*, 547 U.S. at 421-22).

In this Court's view, Plaintiff's speech and activity in mustering the collective will of his coworkers and DIFS to prohibit the IFE falls outside protected First Amendment activity, given Plaintiff's job responsibilities and the nature of DIFS' role as a public agency. But even if portions or aspects of Plaintiff's conduct were so considered, the Court concludes that Plaintiff's First Amendment claim otherwise fails.

### b. Pickering Balancing Test

Even if Plaintiff's speech and activities, or portions thereof, fall under the rubric of a private citizen addressing matters of public concern, the *Pickering* balancing test applies to defeat his claim of wrongful termination. *See McMurphy v. City of Flushing*, 802 F.2d 191, 197 (6th Cir. 1986) (*Connick* reaffirmed that if any part of the speech of an employee that contributes to the

discharge relates to matters of public concern, the trial court must conduct a *Pickering* balancing of interests). The Court must "balance the justifications for a speech restriction against the employee's free speech interest." *Boulton*, 795 F.3d at 531 (citing *Garcetti*, 547 U.S. at 418).

Defendants argue, persuasively, that Plaintiff's conduct was sufficiently disruptive to the statutory mission of DIFS to warrant termination under the test set forth in *Pickering*, 391 U.S. at 568. Defendants contend that Plaintiff's speech was disruptive because, as the Michigan courts have already held,[2] it disclosed information that Michigan law deems confidential and jeopardized the mission of DIFS, as well as DIFS' working relationship with similar regulatory bodies in other states and countries (ECF No. 39 at PageID.219). Plaintiff has not shown otherwise. Accordingly, the Court concludes that the balancing test weighs in Defendants' favor, and Plaintiff's claim likewise fails for this reason.

### 2.  Substantial or Motivating Factor

Finally, and alternatively, even if Plaintiff established the first element of his First Amendment retaliation claim by showing he engaged in protected activity, his claims fail under the third prong of a prima facie case. Plaintiff has failed to show that any protected speech and activity was a "substantial" or "motivating factor" in Defendants' adverse action against Plaintiff.

"'If the employee establishes a prima facie [First Amendment Retaliation] case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to

---

[2] Defendants argue that these factual issues were conclusively determined in the state administrative proceedings and the state circuit court, and therefore collateral estoppel bars Plaintiff from relitigating them. This legal conclusion is unnecessary to the Court's analysis, and the Court declines to so rule.

the plaintiff, no reasonable juror could fail to return a verdict for the defendant.'" *Boulton*, 795 F.3d at 531 (quoting *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

"To establish that the at-issue constitutionally protected speech motivated the adverse action, a plaintiff must 'point to specific, nonconclusory allegations reasonably linking her speech to the employer discipline.'" *Clemens v. Mount Clemens Cmty. Sch. Dist.*, No. 16-11444, 2018 WL 1570281, at \*8 (E.D. Mich. Mar. 30, 2018) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (internal citation omitted)).

Plaintiff has failed to make this showing. There is ample evidence in the record showing that Defendants' actions were taken because of concerns about and breaches of Plaintiff's confidentiality obligations and violations of DIFS policy. In short, DIFS claimed that Plaintiff violated DIFS Policy T-5, the IT Policy, and CSC Rule 2-8, based on the investigatory interview with Plaintiff and a review of nine emails. Policy T-05, *Information Privacy and Security – Handling*, classifies DIFS information as public, sensitive, or restricted; all information is per se classified as *sensitive* (intended for internal use) unless otherwise categorized by DIFS' directors. Policy T-5 lists prohibited conduct when DIFS information is involved, and it incorporates DTMB Policy 1340.00, *Information Technology Information Security Policy* (the IT policy), which applies to all state employees (ECF No. 40-1 at PageID.226-227, 234).

Policy G-3, *Confidentiality and Oath of Office*, prohibits DIFS employees from disclosing facts or information obtained during their employment with DIFS to non-DIFS personnel or entities unless specifically required by law or authorized by the director. The policy places the

responsibility on the employee to obtain guidance from a supervisor when disclosing facts, information, or records pertaining to DIFS-related business.[3]

Plaintiff's state grievance and appeal decisions set forth the facts, the policies, and extensive reasoning in reaching the determination that DIFS had just cause to discipline Plaintiff (ECF Nos. 40-1, 40-2). The Appeal Board ultimately concluded that the record showed Plaintiff violated Policy G-3 by not obtaining guidance from Defendants Boven or Gregg before disclosing Department-related business, and Policies T-5 and G-3 by prematurely releasing the name of an insurer subject to an MCE and by discussing with attorney Sinas issues in a pending MCE:

> There does not appear to be any question that Haddad's March 30, 2015 email to Sinas provided information that was not publicly available until April 2, 2015, when the MCE report was published. That email also arguably allowed Sinas to know the identity of insurers the Department was next going to examine. The record also shows that Haddad did not contact Boven or Gregg before communicating with Sinas or Brake [who was not a Department employee].
>
> Haddad admitted speaking with Sinas in May 2014 about issues he found in a pending MCE. Though Sinas testified that it was only general information about IMEs, Supreme Court opinions, and a certain type of lawsuit, the record shows that Haddad used confidential communications to prepare those questions, and that the issues he spoke about were all directly related to the pending MCE.

(ECF No. 40-2 at PageID.247). The Board agreed that those actions violated the Department's confidentiality policies (*id.*).

---

[3] CSC Rule 2-8 imposes a duty on classified employees to maintain a high degree of loyalty and ethical standards. The main premise of the Rule is that classified employees may not release confidential information for financial gain or value. However, DIFS did not specify the provisions of this Rule allegedly violated, and the grievance hearing officer found no evidence that Plaintiff violated, for example, Rule 2-8.2 concerning financial gain and supplemental employment (ECF No. 40-1 at PageID.234, 236).

Even without giving conclusive effect to the state administrative findings, the record fully supports this result. Plaintiff has failed to present evidence to warrant a contrary conclusion. Defendants are entitled to summary judgment of Plaintiff's First Amendment Retaliation claim.

## C. Fifth Amendment Claim

Plaintiff alleges Defendants violated his Fifth Amendment rights by procuring his signature on a *Garrity* form, which stated that the results of the compelled interview by Defendants Boven and Gregg would not be used for criminal prosecution, but later submitting the statements Plaintiff made to the Michigan Attorney General and requesting criminal charges be instituted.

Defendants acknowledge that *Garrity* precludes the use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation. *See Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). Defendants argue, however, that it is only once compelled incriminating statements are used in a criminal proceeding that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action. *See McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005); *see also Lingler v. Fechko*, 312 F.3d 237, 238-40 (6th Cir. 2002) (finding no Fifth Amendment violation sufficient to sustain a § 1983 action where police officer-employees who had made incriminating statements in compulsory interviews with superiors were never prosecuted). Defendants contend that Plaintiff cannot maintain a claim based on *Garrity* because it is undisputed that none of Plaintiff's statements have ever been used against him in any criminal proceeding.

"'[M]ere coercion does not violate the ... Self-Incrimination Clause absent use of the compelled statements in a criminal case.'" *McKinley*, 404 F.3d at 430 (quoting *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion) (footnote omitted)). "It is only once compelled incriminating statements are used in a criminal proceeding, as a plurality of six justices held in

*Chavez v. Martinez*, that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action." *Id.* (citing *Chavez*, 538 U.S. at 769, 772-73 (footnote omitted)).

Plaintiff responds that while *McKinley* "implied, in dicta," a requirement that statements later actually be *used* in a criminal prosecution, subsequent decisions of the Sixth Circuit have relaxed this requirement (ECF No. 42 at PageID.438). Plaintiff notes that *McKinley* was based on *Chavez*, and the Sixth Circuit read *Chavez* as requiring a criminal prosecution before a Fifth Amendment claim would lie for a *Garrity* violation (*id.*). Plaintiff contends that the Sixth Circuit revisited its read of *Chavez* in *Moody v. Michigan Gaming Control Board*, 790 F.3d 669, 674-77 (6th Cir. 2015), and "[a]fter reading the *Chavez* decision more closely, the *Moody* Court concluded that '[b]ecause the [*Chavez*] Court's judgment depended on Justice Souter's fact-specific view of the law, Justice Thomas's broader suggestion—that mere compulsion of testimony, without more, does not violate constitutional rights against self-incrimination—*does not bind us in different situations*'" (ECF No. 42 at PageID.438, quoting *Moody*, *supra* (emphasis added)).

The Court is unpersuaded by Plaintiff's argument. The *Moody* Court distinguished *Chavez* from the circumstances in *Moody*, and noted that "'*Chavez* only applies where a party actually makes self-incriminating statements ….'" *Moody*, 790 F.3d at 675 (citation omitted). In *Moody*, the plaintiffs asserted their rights clearly, "[b]ut, for four years, the state declined to offer immunity or to allow plaintiffs to make a living at the racetrack." *Moody*, 790 F.3d at 676.

Here, the *Garrity* form precluded the use of Plaintiff's statements in a criminal proceeding. Plaintiff's statements have not been used in a criminal proceeding against him. The Court finds no Fifth Amendment violation.

The analysis in *Moody* does not provide a basis for Plaintiff's claim based on a Garrity violation. The *Moody* Court distinguished the earlier cases:

Like *Chavez*, *McKinley* does not apply here. As Justice Thomas acknowledged in *Chavez*, "governments may penalize public employees and government contractors ... to induce them to respond to inquiries [*only*] *so long as* the answers elicited ... are immunized from use in any criminal case against the speaker." Chavez, 538 U.S. at 768, 123 S. Ct. 1994 (plurality op.) (emphasis added).

790 F.3d at 676; *see also Arsan v. Keller*, No. 3:17-cv-121, 2018 WL 635894, at \*4 (S.D. Ohio Jan. 31, 2018) (again recognizing that under *McKinley*, it is only once compelled incriminating statements are used in a criminal proceeding that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action).

While the *Chavez* decision may leave room for a challenge to the use of coerced statements in a grand jury proceeding, the thrust of the opinion rests on the view that the Fifth Amendment is a trial protection. *McKinley*, 404 F.3d at 430 n.11 (citing *Chavez*, 538 U.S. at 766-68). Plaintiff has failed to show that a *Garrity* violation is sustainable on the facts presented, under the authority cited. Defendants are entitled to summary judgment of Plaintiff's Fifth Amendment claim.

## D. Qualified Immunity

Defendants argue that Gregg and Boven are entitled to qualified immunity on claims for money damages against them in their individual capacities. The doctrine of qualified immunity affords protection against individual liability for civil damages when officials have not violated a "clearly established statutory or constitutional right of which a reasonable person would have known." *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985); *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996) (citation omitted); *see also Causey v. City of Bay City*, 442 F.3d 524, 528 (6th Cir. 2006).

To determine whether an officer is entitled to qualified immunity, the court employs a two-step analysis: "'(1) whether, considering the allegations in a light most favorable to the party

injured, a constitutional right has been violated, and (2) whether that right was clearly established.'" *Causey*, 442 F.3d at 528 (citation and footnote omitted). These steps can be undertaken in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Having determined above that Defendants did not violate Plaintiff's constitutional rights, Defendants Boven and Gregg are entitled to summary judgment on their defense of qualified immunity.[4]

## IV. CONCLUSION

For the reasons above, Defendants' motion for summary judgment is properly granted. A Judgment will be entered consistent with this Opinion and Order.

Accordingly:

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 38) is GRANTED.

Dated: May 16, 2018                              /s/ Janet T. Neff

                                                 JANET T. NEFF
                                                 United States District Judge

---

[4] Because the claims against the individual Defendants fail, the claims against DIFS would fail as a matter of law. *See, e.g.*, *Phifer v. City of Grand Rapids*, 657 F. Supp. 2d 867, 876 (W.D. Mich. 2009) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 900 (6th Cir. 2004) ("'A municipality … cannot be liable under § 1983 absent an underlying constitutional violation by its officers.'")).